GEORGE A. WRAY, Petitioner

v.

PAULETTE A. WRAY, Respondent

High Court of American Samoa
Trial Division

DR No. 92-83

July 22, 1987

Before REES, Chief Justice, TAUANU'U, Chief Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Petitioner, Togiola T.A. Tulafono
For Respondent, Roy J.D. Hall, Jr.

On Motion to Reconsider:

The question before us is whether we erred in granting respondent's motion to set aside a divorce decree.

FACTS

Petitioner (Mr. Wray) filed this action on December 14, 1983, seeking a divorce on the grounds of habitual cruelty and desertion. Respondent (Mrs. Wray) answered, denying the substantive allegations of the complaint and also alleging that both parties lived in Hawaii and not in American Samoa. The respondent further pled that she had filed an action for divorce in Hawaii. She moved that the action be dismissed on the grounds that the court lacked jurisdiction and that American Samoa was an inconvenient forum.

Then-Chief Justice Gardner ordered that the American Samoa proceedings be stayed on the ground that "the ends of justice and fairness require that this action should be tried in . . . Hawaii." Justice Gardner concluded that "[a]ll the factors considered establish inconvenience of this court and convenience of the Hawaiian court." He ordered a stay rather than a dismissal "so that if obstacles develop to prompt litigation in Hawaii, the parties may resume litigation here."

On February 9 of this year, about three years after the stay was granted, counsel for Mr. Wray filed an "Ex Parte Motion to Vacate Stay and Proceed with Hearing on Plaintiff's Complaint." It alleged that "the action in Hawaii has been pending for about five (5) years"; that "Paulette Wray has failed to prosecute that action with diligence"; and that Mr. Wray was therefore "entitled to an immediate hearing on his petition for divorce pursuant to the order of the court dated March 30, 1984 [i.e., Chief Justice Gardner's order staying the Samoa proceedings]."

This ex parte motion was filed at 3:05 on a Monday afternoon. It was brought to the chambers of then-Associate Justice Murphy, who in the absence of the Chief Justice from the Territory was temporarily (until the following evening) in charge of assigning and scheduling cases. Justice Murphy scheduled a hearing on the motion for the following afternoon.

-36-

The lawyer who had represented Mrs. Wray in the American Samoa proceedings three years earlier was notified late Monday afternoon that the case would be heard Tuesday. He appeared at the hearing and requested a ten-day continuance so that he could contact his client in Hawaii. He stated that he had attempted repeatedly to reach her by phone during the eighteen hours or so since he had been notified of the hearing and had been unsuccessful. He did not know whether his client would at that point oppose the granting of a divorce decree in American Samoa or acquiesce in such a decree. Indeed, he said that he had assumed that the proceedings had reached a final conclusion in Hawaii, and that if they had not he knew of no basis on which to oppose the lifting of the stay after three years. He simply asked for a few days in which "to contact my client and determine what her position is."

Counsel for Mr. Wray opposed a continuance on the ground that there could be no real dispute on the merits of whether to grant a divorce, since Mrs. Wray had filed for a divorce in Hawaii and Mr. Wray in Samoa. Therefore ten days could make no difference. Since his client was temporarily in the Territory from Hawaii --- where both parties do in fact reside, although they once resided in American Samoa and Mr. Wray claims his legal domicile here --- and it would be difficult for him to come to the Territory again soon, the divorce should be granted that day.

After a brief hearing (the sole evidence on the merits consisted of Mr. Wray's counsel asking him whether the allegations of habitual cruelty and desertion in his petition were true and Mr. Wray responding that they were[1]) Justice Murphy denied

---

[1] Petitioner's counsel did not even allude to the grounds for divorce in his initial direct examination. At the conclusion of this examination respondent's counsel moved to dismiss, pointing out that the grounds for divorce had not been established. The following exchange ensued:

MR. TULAFONO (counsel for petitioner): Well, Your Honor, if he hasn't cross-examined yet, I would like then to ask the Court to allow me to ask just a couple more questions of Mr. Wray just to repeat what is in his verified

-37-

the motion for a continuance and granted the divorce. He expressed his agreement with Mr. Wray's contention that since both parties wanted to be divorced no purpose could be served by a ten-day delay. Although the judge stated that the request for a continuance was "not unreasonable," he assured counsel that "Mrs. Wray would have an opportunity to contact you and set it aside [in the] ten days that you are talking about . . . . " (This was an apparent reference to the ten days after judgment during which the losing party may file a motion for new trial.)

Mrs. Wray did not file a motion for new trial within ten days. On March 5, however, twenty-five days after the date of the decree, she filed a motion to set aside the decree in accordance with Territorial Court Rule of Civil Procedure 60(b). This rule provides that the court may grant relief

---

petition?
THE COURT: All right, go ahead.
MR. TULAFONO: Q. Mr. Wray, you've stated during the course of the marriage Mrs. Wray has lack of interest [in the] desire[s] of petition[er] and has habitual cruelty towards yourself causing extreme and physical anguish, is that correct?
A. That's correct.
Q. And that Mrs. Wray has deserted you since July 19 of 1982, is that correct?
A. That would be correct.
Q. And then in following with that you have since lived separately as you've previously testified?
A. Yes, she wanted to go off on her own in July 1982. She summarily left the house leaving me with the kids for the better part of the month and the kids went back and forth and up to then through March of 1983 she begged me to leave the house because she wanted to have a complete mind to pursue her own career and finally in March of '83 it got to be impossible for me to remain in the same house.
THE COURT: Gentlemen, I realize that the statute of American Samoa [provides for] divorces on the bases of fault. I think fault has been established in this case. . . .

-38-

from a judgment after the expiration of the ten-day period on any of several extraordinary grounds. The grounds for her motion were "newly discovered evidence" and "fraud." She alleged (1) that the decree "was based on untrue statements made by the petitioner at the time of the hearing" and (2) that Mr. Wray was aware when he moved for the expedited hearing that Mrs. Wray had just left Hawaii for a month-long trip to Europe and therefore that counsel would be unable to reach her.

Upon her return to Hawaii on March 1, Mrs. Wray had received her lawyer's messages to contact him. Her reaction upon learning that a divorce had been granted in American Samoa was one of shock and outrage; she had talked with Mr. Wray on the telephone on February 7, just before she left for Europe and he for Samoa, and he had said nothing about reopening the American Samoa proceeding. Mrs. Wray maintains, contrary to the representations that persuaded Justice Murphy to lift the stay order imposed by Chief Justice Gardner, that she has diligently pursued her Hawaii divorce action and that substantial progress has been made in that action. She further maintains that the delay in bringing those proceedings to a final conclusion has been caused partly by a serious accident suffered by Mr. Wray in 1984 and his subsequent recuperation, partly by a serious financial setback suffered in the same year and ensuing legal complications, and partly by Mr. Wray's own delaying maneuvers.

These actions on the part of Mr. Wray, of which he denies some details but which are proved by the affidavits and other exhibits submitted, included:

(1) Failure to sign a negotiated divorce settlement to which he had previously agreed. On September 24, 1984, Mr. Wray's then-counsel wrote to Mrs. Wray's counsel in order "to confirm that we have a settlement in the above-referenced matter based on my client's acceptance of Mrs. Wray's alternative counter-offer . . . ." It is inconceivable that Mr. Wray's lawyer would have written such a letter without authority to do so. On October 10, 1984, a document incorporating the agreement (which had already been reduced to writing when Mr. Wray's attorney had communicated his client's acceptance of it) was sent to Mr. Wray for his signature. It was never signed.

-39-

(2) Failure to inform Mrs. Wray that he intended to renounce the settlement to which he had previously agreed. At the time Mr. Wray received the document he was in the hospital and was physically unable to sign his name. In the same month he suffered a serious financial setback, leading to corporate reorganization proceedings which are not yet resolved. Mrs. Wray maintains that Mr. Wray never told her that he would not sign the agreement, but only that he did not presently have the money to comply with it. Under the circumstances she was willing to wait until the conclusion of the corporate reorganization proceedings. She maintains that her first notice that he had finally renounced the Hawaii settlement was in March of this year when she learned of the decree he had obtained in Samoa. Mr. Wray does not deny this; indeed, the statement in his affidavit that Mrs. Wray "never brought up the proposal [i.e., the settlement to which he had agreed] with me again" seems implicitly to admit that he never notified her of any intention to renounce it.

(3) Tenacious resistance to discovery requests. At least one controversy over Mrs. Wray's attempts to discover Mr. Wray's assets appears still to be pending in the Hawaii court.

(4) A request in mid-1986, after his Hawaii attorney had requested and been given permission to withdraw, for a continuance in order to find a new attorney. The court granted him "at least three weeks" to do so.

(5) Subsequent failure to retain new counsel in the Hawaii proceedings.

The hearing on the motion to vacate the American Samoa divorce decree was postponed twice at the request of counsel for Mr. Wray.[2] The

---

[2] We recount the reason for our delay in hearing the Rule 60(b) motion in response to Mr. Wray's contention, made in connection with a motion filed May 28, 1987, that until the previous week he had had no reason to suspect that the February 10 decree might not be final, and that the sudden and shocking discovery that he was not really divorced was a source of acute mental anguish.

In fact, a copy of Mrs. Wray's motion to set aside the divorce decree was served on Mr. Wray's counsel in early March. On March 13,

motion was heard on May 6 and the decree was set aside. We declined at that time to decide whether Mr. Wray (a member of the bar in this Territory) had committed "fraud, misrepresentation, or other misconduct" in making an ex parte motion for a hearing at a time when he knew Mrs. Wray's counsel would be unable to reach her, and in withholding his knowledge of her whereabouts from the court even when the judge based his decision on the understanding that Mrs. Wray and her counsel would have ten days after the judgment in which to contact each other and decide whether to move for a new trial.[3] We decided, however, that this was at

---

upon the first request for a continuance by Mr. Wray's counsel, this court took the unusual step of issuing a written opinion on a motion for a continuance. We granted the continuance but made it clear that the motion to set aside the divorce decree was receiving "active and serious consideration." This was done so that nobody in Hawaii would be misled about the status of the American Samoa proceedings. That Mr. Wray apparently did not learn of the motion until two months later was due to difficulties of communication between him and his lawyer. We recount this procedural history not to criticize Mr. Wray or his lawyer but to make it clear that the Rule 60(b) proceedings have been conducted with scrupulous regard for the rights of both parties.

[3]. We do now decide, on the basis of the numerous affidavits and exhibits submitted by both parties, that the following false or misleading statements constituted misrepresentations:

(a) Petitioner's representation in his ex parte motion to vacate the stay order that "the action in Hawaii has been pending for about five (5) years."

(b) The representation in the same motion that "Paulette Wray has failed to prosecute that action with diligence."

(c) Mr. Wray's testimony at the February 10 hearing that he could "recall no particular request" by Mrs. Wray for a "particular property division or distribution." As the exhibits and affidavits make clear, she had requested a detailed settlement including $500,000 in cash and Mr. Wray's attorney had communicated his client's agreement to this

-41-

least the sort of "surprise" on which relief can be granted under Rule 60(b)(1). Moreover, Mrs. Wray's affidavits to the effect that substantial progress had been made in the Hawaii proceeding, and that the delays in that proceeding had been partly unavoidable and partly the result of Mr. Wray's own efforts, were "newly discovered evidence" on whether the stay in the American Samoa proceeding should have been lifted.

Mr. Wray now urges us to reverse our ruling and reinstate the divorce decree. He makes three arguments:

(1) A Rule 60(b) motion to set aside a decree "should not be used as a substitute for an appeal";

(2) Even if a court finds that a proceeding was tainted by fraud or unfair surprise, or that there is newly discovered evidence which counsel could not have discovered by diligent efforts in the original proceeding, the court should deny a

---

settlement. This misrepresentation was material because a truthful answer might have brought out important facts about the actual status of the Hawaii proceedings, thereby leading the court to conclude that Mrs. Wray had in fact pursued her action with diligence.

(d) Mr. Wray's testimony that "for the past year and a half" he had given Mrs. Wray no funds and that "she has not asked for any." Although perhaps not technically untrue, this statement was highly misleading in that it ignored the continuing effect of a court order obtained by Mrs. Wray in September 1985 (almost exactly a year and a half earlier) requiring Mr. Wray to pay support arrearages. Again, a less misleading answer might have called attention to the diligence with which Mrs. Wray has pursued the Hawaii action.

We make no finding that any of these statements constituted "fraud"; at least some of them may have been honestly believed by Mr. Wray and/or his lawyer, or may have been within the scope of an attorney's zealous representation of his client. In specifying "fraud, misrepresentation, or other misconduct" as bases for relief from a judgment, however, Rule 60(b) clearly authorizes such relief on the basis of non-fraudulent misrepresentations when justice so requires.

Rule 60(b) motion unless it further finds that the aggrieved party alleges facts which, if proved upon retrial, would result in a decision <u>on the merits</u>. In the case before us petitioner urges that evidence and arguments about whether the stay should have been lifted are irrelevant unless respondent also produces evidence that there is no ground for a divorce between the parties.

(3) Mr. Wray has also submitted his own affidavit contesting Mrs. Wray's version of the reasons for the delay in the Hawaii proceeding.

### I. Rule 60(b) as a "Substitute for Appeal."

Petitioner is correct in pointing out that a court should not grant a Rule 60(b) motion on the basis of objections that could have been raised in an appeal. Although our decision to vacate the decree was based on surprise and newly discovered evidence, we did comment on other irregularities in the proceeding in which the decree was granted.

It is difficult to imagine circumstances that would justify the denial of a brief continuance requested by an attorney for a represented party who has received less than 24 hours' notice of a hearing in a matter that has lain dormant for three years, who has been unable to contact his client, and who does not know the facts of the case or his client's position on the merits. To proceed immediately to final judgment against a party who is subject to the aforementioned disadvantages would seem to constitute such a gross abuse of discretion that it should surely be reversed on appeal or on a Rule 59 motion for new trial.[4]

---

4. Indeed, in rejecting the motion for a ten-day continuance Justice Murphy relied heavily on his belief that Mrs. Wray would be able to file a motion for a new trial within ten days, making any arguments she would have made if she had received notice of the trial. Reasonable people can differ over the extent to which the possibility of a motion for new trial mitigates the unfairness of holding a trial without any notice whatever to the defendant. Justice Murphy's observation, however, underscores the injustice of allowing the February 10 decree to remain final when Mrs. Wray in fact had no reasonable opportunity to file a motion for new trial within ten days.

Since objections to the judge's conduct of the proceeding could have been raised by appeal, however (or could have been so raised if Mrs. Wray's counsel had been able to reach her within ten days of the judgment), petitioner is correct in his contention that we should not consider them on a Rule 60(b) motion.

The decree in this case, therefore, should not have been set aside unless the setting aside was justified by facts and arguments that were unknown to petitioner's counsel and therefore could not have been raised by appeal, or unless the failure to bring an appeal constituted "excusable neglect" within the meaning of Rule 60(b)(1). The facts and arguments unavailable to Mrs. Wray's counsel as bases for appeal were (1) the filing of an ex parte motion for an immediate trial of the divorce action at a time when Mr. Wray knew (but the judge and Mrs. Wray's counsel did not know) that Mrs. Wray would be incommunicado for about a month; (2) the representations by Mr. Wray and his counsel that Mrs. Wray had not diligently pursued the Hawaii proceedings and that the condition set by Chief Justice Gardner for lifting the stay order had therefore been met; and (3) her later submission of convincing evidence that she had in fact pursued the Hawaii action diligently, so that the stay should have remained in force.

We conclude that this course of events comprised misrepresentation, unfair surprise, and newly discovered evidence, each of which would be sufficient to justify relief under Rule 60(b). At the very least it is clear that Mrs. Wray's failure to file a motion for new trial within the requisite 10 days --- during which she was still away from home, not in communication with her lawyer, and unaware of the divorce decree, as Mr. Wray knew she would be --- was "excusable neglect" sufficient to justify relief under Rule 60(b).

## II. The Likelihood of a Different Outcome on Retrial

Even on the assumption that the decree in this case was tainted by one or more of the circumstances under which a court may grant relief under Rule 60(b), petitioner argues that we had no power to grant such relief because respondent did not fulfil an additional requirement that she must assert "a meritorious defense to the facts supporting the relief granted." Although no such requirement is explicit in the rule itself,

-44-

petitioner cites numerous cases denying relief under the identical federal rule in the absence of claims or defenses which, if proved, would justify a different result on retrial.

While this court is not bound to interpret its own rules in conformity with every judicial gloss that has been written on the federal rules, we are in full agreement with the cases cited by petitioner. Whether to grant relief from a judgment is a matter of judicial discretion and should only be granted "on such terms as are just." T.C.R.C.P. Rule 60(b). It hardly seems just to put the parties and the court through a second proceeding when there is no chance that the parties will emerge with different rights and obligations than they had as a result of the first proceeding, however badly flawed it might have been.

The setting aside of the divorce decree was anything but this sort of pointless exercise. In the first place, Mrs. Wray <u>has</u> asserted defenses on the merits; in her answer to the petition she specifically denied the allegations of habitual cruelty and desertion. In light of the minimal and highly conclusory evidence adduced in support of these allegations, Mrs. Wray's equally conclusory denials would satisfy the requirement that there be some prospect of a different outcome on retrial.[5]

---

[5] See, e.g., <u>Tolson v. Hodge</u>, 411 F.2d 123 (4th Cir. 1969) (allegation in party's pleading that "the sole proximate cause of the accident was defendant's decedent's negligence" met meritorious defense criterion); <u>Feliciano v. Reliant Tooling Co.</u>, 691 F.2d 613 (3d Cir. 1982) (affirmation by lawyer for insurance company that the law supported his client's contention that its policy did not cover the plaintiff's injury was sufficient to meet meritorious defense criterion on Rule 60(b) motion); <u>Keegel v. Key West & Carribean Trading Co.</u>, 627 F.2d 372, 374 (D.C. Cir. 1980) (the meritorious defense criterion is met by "broad and conclusory" allegations so long as they "contain 'even a hint of a suggestion' which, proven at trial, would constitute a complete defense").

At the February 10 hearing, after Mr. Wray's brief testimony concerning his wife's alleged desertion and habitual cruelty and Justice's Murphy's finding that fault had been proven, Mrs. Wray's attorney stated that "the

-45-

More importantly, the petitioner's insistence that there must be a defense "on the merits" misapprehends the nature of the rule he urges us to apply. A "meritorious defense" is not synonymous with a "defense on the merits." A defense can be meritorious although it concerns jurisdiction, standing, ripeness, forum non conveniens (the principal issue in this case), or any other issue that might cause a court which had heard both sides of the story never to reach "the merits." See, e.g., Misco Leasing, Inc., v. Vaughn, 450 F.2d 257 (10th Cir. 1971) (trial court's decision that it has jurisdiction over the person of the defendant can be relitigated on a Rule 60(b) motion although no other defense is raised).

The application of the "meritorious defense" rule to this case is further obfuscated by petitioner's frequent reiteration of the argument that there is no dispute on the merits because Mrs. Wray also wants a divorce. The parties have been litigating against each other not because they cannot agree about whether they should be divorced, but because they have serious disagreements about what their rights and obligations should be upon dissolution of the marriage. The weight of the evidence on this motion supports Mrs. Wray's contention that Mr. Wray's recent sortie into the High Court of American Samoa was an effort to divest the Hawaii court of jurisdiction to enforce a settlement including detailed provisions for child custody, support, division of property, and assumption of liabilities, which is apparently unacceptable to him, and perhaps also to divest the court of jurisdiction to enforce an order for support pendente lite with which he has not complied. Whether or not these issues comprise

---

grounds have been established as sufficient to my needs." If, as petitioner suggests, this should be construed as a judicial admission, it was clearly an admission that Mrs. Wray had not authorized her attorney to make and would not have authorized him to make if she had been given an opportunity to discuss the case with him prior to the hearing. It was therefore not effective as a waiver of her right to deny that she was habitually cruel or had deserted Mr. Wray. See In re Gsand, 153 F.2d 1001 (3d Cir. 1946), and authorities cited therein.

-46-

"the merits" of the divorce action, they are important questions on which the parties disagree.

We are unpersuaded by petitioner's contention that these issues are immaterial to the Rule 60(b) motion because Justice Murphy made no final order with respect to them. There is some chance Mrs. Wray could eventually obtain the post-divorce relief she seeks by coming to American Samoa to litigate these aspects of her case, but there are important reasons --- including the difficulties a court can encounter in dealing with persons and property outside its jurisdiction, differences in the law (including choice-of-law rules) applied in different places, and logistical problems inherent in litigating 2500 miles from home --- that could substantially affect both the timing and the ultimate likelihood of any such order.

Nor is it inconsequential that the Hawaii decree would be on the ground that the marriage has been "irretrievably broken," whereas the order summarily entered in American Samoa brands Mrs. Wray as habitually cruel and a deserter.[6] Even if this were the only point of genuine dispute between

---

[6] The statutes of American Samoa do not provide for divorce on the ground of "irretrievable breakdown." Unlike the statutes of Hawaii and most other states, the territorial statutes provide only for "fault-based" divorce unless the parties have been living separately for more than five years. See A.S.C.A. §§ 42.0201-08; Lea'e v. Lea'e, 3 A.S.R.2d 51 (1986). The territorial Senate recently debated and emphatically rejected a bill (submitted by the Governor at the suggestion of the author of the present opinion) that would have allowed "no-fault" divorce after only two years of separation. Petitioner's assertion that there is no difference "on the merits" between the "habitual cruelty and desertion" divorce he seeks here and the "irretrievable breakdown" divorce respondent seeks in Hawaii amounts to a contention that there is no difference between the law the Fono enacted and the law it rejected. Even if the court were otherwise disposed to accept the argument that "since both parties want a divorce, what's the big deal?" our responsibility to enforce the statutory law of American Samoa precludes us from so doing.

-47-

the parties, Rule 60(b) would authorize relief and the circumstances of this case would convince us that justice requires it.

In any case, Mr. Wray's actions convince us that he agrees with Mrs. Wray's assertion that it would be substantially to her disadvantage to shift jurisdiction of all remaining issues to Samoa. Chief Justice Gardner's order staying the Samoa proceedings was based on his conclusion that it would be contrary to "the ends of justice and fairness" to put her at such a disadvantage. That order was made after full briefing and argument by counsel for both parties. It was summarily vacated on Mr. Wray's explicit and unchallenged representation that Mrs. Wray had unreasonably delayed the Hawaii proceedings. We have concluded, on the basis of evidence unknown to the judge and to respondent's counsel at the time, that this representation was false and that Justice Gardner's decision that Hawaii was the fairest and most convenient forum should therefore not have been disturbed. If we were otherwise correct in this judgment, it is utterly irrelevant that each party wishes somehow and somewhere to be divorced.

The principal purpose and effect of Mr. Wray's motion in the High Court was to divest his wife of the right to proceed in Hawaii. This right is important and potentially fruitful: both parties are obviously convinced that its exercise is likely to result in the ultimate placement of dollars in the pocket of one party rather than the other. A proceeding that divests such a right without notice or the opportunity to be heard cannot be insulated from review by invocation of a rule designed only to prevent relitigation of proceedings which, although tainted, have not worked any real disadvantage on the losing party.

### III. The Status of the Hawaii Proceeding

After the hearing on this Motion to Reconsider, Mr. Wray submitted an affidavit to the effect that some of the delay in the Hawaii proceeding has been caused not by himself but by Mrs. Wray. The affidavit alleges that since June of 1986 (the end of the period of "at least three weeks" that the judge gave Mr. Wray to find a new lawyer) Mrs. Wray has been free to press for a conclusion of the Hawaii action and has not done so.

-48-

Mrs. Wray does not disagree with this allegation, but says she was under the impression that both parties were waiting for the conclusion of Chapter 11 bankruptcy (reorganization) proceedings involving South Pacific Island Airways, Inc. (SPIA), a corporation founded by Mr. Wray which she characterizes as "the parties' principal marital asset." She attests that "Mr. Wray has never indicated to her that he would not comply with the agreement [i.e., the Hawaii divorce settlement]; instead he has consistently claimed that he does not currently have any money with which to do so." She further attests that she believes the SPIA proceedings "are approaching a final disposition," and that she "was willing to wait until SPIA's financial situation was resolved before moving to enforce the agreement," since Mr. Wray may "then have the funds necessary to implement" this agreement.

Mrs. Wray's affidavit and that of her Hawaii attorney establish that she has not been guilty of unreasonable delay. To begin with, there is a big difference between the eight months (from June 1986 until February 1987) during which she actually failed to act and the five years alleged by counsel for Mr. Wray or the three years cited by Justice Murphy. The record still reflects that most of the delay since 1984 was either unavoidable or brought about by Mr. Wray. Moreover, Mrs. Wray convincingly asserts that Mr. Wray's actions in the course of the Hawaii proceedings had led her to believe he was in no hurry.[7] As Mr. Wray himself points out, his recuperation from the accident he suffered in 1984 is not yet complete. With regard to the relationship between the SPIA proceedings and the Wrays' divorce, it is quite plausible that Mrs. Wray saw no point in moving for a final order (which would have brought to a head not only the $500,000 property settlement to which Mr. Wray

---

[7] Mr. Wray could easily have disabused his wife of this notion, but did not even arguably do so in time for her to have taken any action in the Hawaii proceedings before he moved to lift the stay in Samoa. On February 7, the day before Mrs. Wray left for Europe and Mr. Wray for Samoa, he mentioned the desirability of concluding a divorce in order that they could become "friends" once again. He proposed, however, no particular terms or timetable and did not mention the possibility of reopening the Samoa proceedings.

-49-

seems to have agreed but also the many thousands of dollars in overdue alimony and child support which he seems not to have paid) at a time when Mr. Wray would have been unable to comply with it. Nor is it unreasonable, in the context of all the circumstances, for her to be reluctant to move for a final order at a time when the "principal marital asset" is temporarily worth far less on paper than it has been during most of the marriage and than it might be a few months from now, when "she has been informed and therefore believes that Mr. Wray may receive a substantial cash settlement for his interest and continued participation in managing SPIA."[8]

Finally, even if the duration and circumstances of Mrs. Wray's inaction were sufficient to give us doubts about whether Justice Gardner's order should have been lifted, such doubt should be resolved against the finality of the summary and one-sided process --- characterized by Justice Murphy as "in the nature of a default proceeding" --- that purported to dispose of these complex questions. See Klapprott v. United States, 335 U.S. 601 (1948) (amendment of Rule 60(b) in 1948, providing that courts can grant relief not only for the reasons specifically listed but also for any other reason justifying relief, "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice"); Tolson v. Hodge, note 5 supra, 411 F.2d at 130 ("It has been held in an extensive line of decisions that [Rule 60(b) is] to be liberally construed in order to provide relief from the onerous consequences of defaults and default judgments."); Tozer v. Charles A. Krause

---

[8] We express no opinion on the merits of the substantive questions lurking behind the parties' positions on procedural matters. We cannot competently decide, on the state of the present record, who really owns the stock in SPIA or whether Mr. Wray should have signed the agreement to which his attorney agreed in 1984. If these matters are to be resolved in this court it should be at the conclusion of a trial with full ' briefing and argument. We merely conclude that in the context of the whole history of these proceedings Mrs. Wray's inaction for a few months during 1986, even if it was partly motivated by considerations of strategy, does not constitute unreasonable delay.

Milling Co., 189 F.2d 242, 245 (1951) ("Any doubt should be resolved in favor of the petition to set aside the judgment so that cases may be decided on their merits." That a trial court applied "a standard of strictness rather than one of liberality in concluding that justice did not require that the judgment be set aside" compelled reversal.)

### Conclusions

To reiterate, we find:

(1) The filing of an ex parte motion to vacate a stay in a matter that had been dormant for three years and to proceed to immediate judgment against the respondent, when petitioner (a) had talked with respondent two days before and had said nothing to her of his intention to make such a motion, (b) knew that petitioner would not be reachable by her attorney for about a month, and (c) did nothing to correct the judge's impression that counsel would be able to contact the petitioner within the ten-day period for the filing of a motion for new trial, constituted unfair surprise within the meaning of Rule 60(b).

(3) The false and misleading representations made by Mr. Wray and his counsel to the effect that Mrs. Wray had unreasonably delayed the Hawaii proceedings were misrepresentation within the meaning of Rule 60(b).

(3) The evidence now before the court, unavailable to counsel for Mrs. Wray and to the judge at the time of the summary proceeding in February, concerning the actual conduct and status of the Hawaii proceedings constitutes newly discovered evidence within the meaning of Rule 60(b).

(4) Even if the above circumstances did not establish other grounds for relief under Rule 60(b), they would establish that Mrs. Wray's failure to file a motion for new trial within ten days after the date of the divorce decree was excusable neglect within the meaning of the Rule.

(5) Mrs. Wray has asserted defenses to the allegations of habitual cruelty and desertion which, if proved upon retrial, would defeat the American Samoa divorce action.

-51-

(6) Even if there were no dispute between the parties on the grounds alleged in the divorce petition, the question of the fairest and most convenient forum for the divorce proceeding is inextricably intertwined with matters of substance on which the parties do disagree. There is a sufficient likelihood that the summary American Samoa proceeding effected a real change in the situation of the parties that it should be vacated to allow for plenary consideration of all matters in dispute between the parties (including the threshold question of the most convenient forum) after notice and an opportunity to be heard.

The setting aside of the divorce decree leaves both parties exactly as they were on the morning of February 9, 1987. Either party is free to move at any time for an immediate conclusion of the Hawaii proceedings or, with notice to the other party and arguments sufficient to convince the Court that Hawaii is no longer the fairest and most convenient forum, for a reopening of the American Samoa proceedings.

The motion is denied.